## Commonwealth *v.* William P. Bowman, Appellant.

*Criminal law—Murder—Misstatement in charge.*

On the trial of an indictment for murder a misstatement of material evidence in the charge is ground for reversal if it may reasonably have had the effect of prejudicing the defense, although it does not appear that it has really done so; but there is no ground for reversal where the error is harmless, and could not have misled the jury.

Where the trial judge on the trial of an indictment for murder states that five witnesses had testified to a certain fact which was not in dispute, and which was admitted by the prisoner, when in fact but two witnesses had so testified, the error is harmless, and the judgment against the prisoner will not be reversed on that account.

Argued May 27, 1895. Appeal, No. 45, July T., 1895, by defendant, from judgment of O. and T. Luzerne Co., Nov. T., 1894, No. 203, on verdict of guilty of murder of the first degree. Before GREEN, WILLIAMS, McCOLLUM, DEAN and FELL, JJ. Affirmed.

Indictment for murder. Before LYNCH, J.

At the trial it appeared that on September 20, 1894, while the prisoner, aged twenty-one, and George Metzgar, aged about seventeen, were seated upon a pile of railroad ties, near the Wilkes-Barre end of the railroad bridge crossing the Susquehanna river from Wilkes-Barre to Plymouth, playing cards, two Arabian peddlers, one named Mike John and the other John Mike, came over the bridge from Plymouth, and at or near the point where the two boys were sitting, John Mike was killed by a pistol shot fired by either Bowman or Metzgar. Mike John, the surviving Arabian, testified that Bowman did the shooting, and that some one after the shooting robbed him. Bowman on the other hand maintained that the Arabians were called over from the northern track by Metzgar, ostensibly to see if they had necktie pins, that while Bowman was examining the box of the living Arabian, Metzgar, without any suspicion on Bowman's part of any evil designs, exclaimed to the deceased, "Your money or your life," and almost immediately shot deceased in the heart; that he (Bowman) turned immediately at the first or second shot and ran to the end of a train

of cars, and then ran along the southerly side of the cars east-
wardly towards Wilkes-Barre; that at some point along the
cars he turned at the sound of shooting and discovered Metzgar
firing at the living Arabian; that Metzgar, after ceasing to
shoot, turned and passed him on the run, and that they so con-
tinued running to the Old River road, which crosses the rail-
road tracks at right angles, where they turned to the south on
this road and went home.

The court charged in part as follows:

According to the evidence of the bridge watchman, Mr. Roth-
ermel, after the first shots had been fired, he arose from where
he had been reading a paper, shut his shanty door and started
up the road. He then saw what he thought was the living
Arabian throwing stones and one of these parties, Metzgar or
Bowman, firing at him, and the living man fell;—he saw some
one run toward and lean over him. Mike John testified, and
he shows you the condition of his coat; he was shot at that
time very near the left nipple, the shot penetrated his coat,
and fell into his inside coat pocket. The ball which it is al-
leged was taken from his coat, and shot on that day, was from a
thirty-two calibre, the same as the weapon shown here. [Roth-
ermel, Disque and Turner, the last two you will remember were
in the field cutting corn, and Sulsinger and Nagle who were in
the gondola car, state when they saw the two men running
from the scene of the shooting the heavy man was ahead, was
before the other one, and it is testified here that Metzgar was
the heavier man.] [3] While I do not express any opinion at
all, and I do not wish to be so understood, I think it is the duty
of the court to call your attention to what appears to be an im-
portant matter of evidence upon which proper inference should
be drawn at this point. The shooting, it is alleged, took from
fifteen seconds to five minutes. The prisoner charges that
Metzgar did the shooting; that, on the discharge of the first or
at the most the second shot, be fled up the track. Now, if that
be true, gentlemen, and you are to consider it, that Metzgar
did the shooting, leaned over the Arabian and took his pocket-
book at some distance below there, how did he pass, in that
short distance of four or five cars, the prisoner on trial? The
commonwealth argues that this is evidence from which the jury
can fairly infer and determine from the facts and circumstances,

together with the positive evidence of Mike John, it was the prisoner who fired the fatal shot, and not Metzgar.

T. R. Martin, Esq., attorney for defendant: " As I recall, neither Mr. Rothermel, nor Disque nor Turner, none of these witnesses state that the heavier man was ahead, not one of these three witnesses.    It was only the two in the gondola car."

Leave that as it may be, you hear what Mr. Martin states. The defendant states that at the distance of four or five cars from the ties where this killing occurred Metzgar did pass him.    Now what is the truth, gentlemen, of that very important inquiry?    Is it true, as testified to by the defendant, that he fled upon the firing of the first or second shot?    Is it also true that it took anywhere from fifteen seconds to five minutes to fire all the shots that were fired there, and that Metzgar did the shooting?    If Mike John was shot, as he claims, and fell to the ground at some fifteen or twenty yards from where his butty, as he calls him, was killed, if he was robbed as he says he was, how long did it take the person who fired the shots after the shooting to go to the injured man and rob him?    It is also in evidence, by Sergeant James Hall, that when he arrived on the scene (he had heard here about half-past five the man had been killed) of the killing, there were five or six persons present; he could get no accurate description of the persons who did the shooting ; he found the dead man's body lying upon a pile of ties, and to use his exact words the deceased's pocket was partly turned out and a small pocket-book with a few coppers in it just falling out, and the other Arabian was crying " My money, my money."    If that be true, gentlemen, is it an evidence to your mind, or does it tend to satisfy you that the pocket was turned out by accident or in some other way than by the prisoner or his companion on that day?    If they did it, how long a time did it take?    You will see the materiality of the questions which I put to you because the commission of the whole crime must have occurred within a very short time.    There is no denial that a foul, bold and cold-blooded murder was committed.    The only question is did this defendant, the prisoner, commit that offense, either with his own hand, or by aiding, abetting and encouraging Metzgar, either in the robbery, if there was a robbery, or in the murder?

The prisoner states on this important branch of the case that he stopped a moment, looked back, then Metzgar passed him and he then followed Metzgar. In their haste it is quite evident they either saw none of the persons who saw this, or very few. Turner and Disque were seven or eight hundred feet away from the scene in the cornfield, and you will remember that they were, according to the evidence of one of them, some eight or ten or twelve feet lower than the filled up part of this railroad where the crime occurred. Some of the witnesses, I think Disque or Turner, or both, state that when they arrived at the scene of the killing the Arabian was not dead, but he was gasping and died shortly after; that when they first saw the person who was killed his companion was drawing him up the embankment. That is an important question for the jury to consider. If he were shot near the ties and the railroad, how did he get down the embankment before he dropped, or did he get down the embankment at all? As I recall, the other evidence tends to show the man fell either near the track or near the frog toward the bridge. Some of the witnesses say after the man was shot he ran or staggered several feet and then fell. If he were shot at the edge of the declivity of the embankment, if there is any such evidence as that, who did it? If he were shot between the ties and the railroad,—as I think if not positively testified to it is circumstantially shown by some of the witnesses,—who fired the shot? The defendant as shown by himself sat at the upper—toward Wilkes-Barre—corner of the pile of ties, toward the embankment, and Metzgar sat diagonally across the pile of ties facing the railroad, and toward the bridge.

If you are not satisfied from the credible evidence in the case, and beyond a reasonable doubt, that the prisoner Bowman participated or took part in either the robbery, if there was one, or the attempt to rob, or the killing of this man, of course he ought not to be convicted. There would seem to be no middle ground. It is for the jury to decide in their verdict the degree, it is for the court to say what evidence constitutes the degree, and I say that, if you believe the evidence of all who have testified as to the actual killing, there was a murder in the first degree perpetrated.

Verdict of guilty of murder in the first degree.

*Error assigned*, among others, was (3) portion of charge as above, quoting it.

*J. D. Farnham* and *T. R. Martin, Joseph Moore* with them, for appellant.—A misstatement of material evidence by the judge, and that the full presentation of the case of one side only, the theory and evidence of the other being slighted, are grounds for reversal : Com. v. Silcox, 161 Pa. 484 ; Goerson v. Com., 99 Pa. 388 ; Steinbrunner v. Ry. Co., 146 Pa. 504 ; McKelvy v. Ins. Co., 161 Pa. 279 ; Ry. Co. v. Alvord, 128 Pa. 42 ; Gehman v. Erdman, 105 Pa. 371 ; Fawcett v. Fawcett, 95 Pa. 376 ; Musselman v. Ry. Co., 2 W. N. C. 105.

*John M. Garman, D. A. Fell, Jr.*, district attorney, with him, for appellee.—The mistake of the court below was in stating that the testimony of five witnesses went to a certain fact, whereas but two of the witnesses named had testified to it. However, as the defendant had himself admitted the fact as a fact, it can hardly be satisfactorily argued that a mere mistake in naming the witnesses who testified to an admitted fact could prejudice the defendant's case.   This would be harmless error : 3 Rice on Evidence, p. 198, sec. 144.

OPINION BY MR. JUSTICE FELL, October 7, 1895 :

It was admitted that the appellant was present when the murder of which he was convicted was committed.   The fatal shot was fired either by him or by his companion Metzgar.   He testified that Metzgar did the shooting, that there was no pre-arrangement or concert of action between them, that he had no previous knowledge of Metzgar's intention, and that he ran when the first shot was fired and was followed by Metzgar, who overtook and passed him.

Two witnesses whose attention was attracted by the noise of the first discharge of the pistol saw the shots afterwards fired, and observed the movements of the parties at the time.   Two who did not witness the shooting saw Bowman and Metzgar as they ran from the scene of the murder.   Another heard the shots but saw nothing of the occurrence.   Speaking of these five witnesses the learned judge in charging the jury said : " Rothermal, Disque and Turner, the two last, you will remem-

ber were in the field cutting corn, and Sulsinger and Nagle, who were in the gondola car, state that when they saw the two men running from the scene of the shooting the heavier man was ahead, was before the other one, and it is testified that Metzgar was the heavier man." This statement was inaccu-rate, as only two of the witnesses, Sulsinger and Nagle, had so testified. The others had witnessed a part of the occurrence, but had not seen Bowman and Metzgar running from the scene. This inaccuracy is the subject of the third assignment of error, and to it the elaborate and able argument of the appellant's counsel is mainly directed.

The error complained of was not in misstating the testimony as to an alleged occurrence, but in saying that five witnesses had testified to it when but two had done so. The fact was not in dispute. The appellant had admitted that as they ran from the scene of the murder he was in advance of Metzgar. The effect of the error then was not to establish a fact preju-dicial to the defense, and it was harmless unless it tended to weaken the defense by raising an apparent contradiction in the testimony as to other material matters.

Neither Bowman nor Metzgar was identified by any of the witnesses except by their apparent size. Bowman was the smaller. Disque had testified that the larger man had the re-volver and did the shooting, and that the smaller man ran after the first shot. To some extent this testimony was confirmed by Rothermal, and the testimony of these two witnesses har-monized with and tended to strengthen Bowman's statement. Under all the testimony it was probable that the one of these two men who remained longer committed the murder and rob-bery. The effort of the defense was to show that Bowman left the scene first. Its weakness was in the fact, which was estab-lished beyond dispute, that at a point forty or fifty yards from the place where the crime was committed, and when they were both running to effect their escape, Bowman was behind Metz-gar. His explanation was that he had stopped to see what Metzgar was doing, and had been overtaken by him.

The occurrences of which the witnesses spoke were distinct, and it is only by blending them into one that any uncertainty or doubt arises. Three witnesses testified to what took place at the time the shots were fired, and two to the position of the

parties at the time of their flight. It was of the latter that the learned judge spoke. If all of these witnesses had testified as they were erroneously stated to have done, the defense would not have been weakened thereby, as there would have been no necessary conflict in their testimony and their statements would have corresponded exactly with that of the appellant.

A misstatement in the charge of material evidence, which may have injured the accused, is ground for reversal, and it need not appear that it did prejudice the defense; it is sufficient if it may reasonably have had such an effect. But there is no ground for reversal where the error is harmless and could not have misled the jury. It is unnecessary to consider the remaining assignments in detail; we find no adequate reason for sustaining any of them. The trial was carefully conducted, and the charge contains a full and fair presentation of the defense.

The judgment is affirmed, and it is directed that the record be remitted in order that the sentence may be carried into execution according to law.